**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Criminal Case No.  09-cr-00497-REB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  RICK GLEN STRANDLOF,
      a/k/a Rick Duncan,

      Defendant.

---

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS INFORMATION

---

**Blackburn, J.**

      The matter before me is defendant's **Motion To Dismiss Information** [#13][1] filed

December 2, 2009.  Having considered the motion and response and their

supplements, as well as the arguments and authorities presented by *amicus curiae*,[2] I

find and conclude that the statute under which defendant is charged is unconstitutional

as a content-based restriction on First Amendment speech that is not narrowly tailored

to serve a compelling government interest.  Accordingly, I grant the motion.

---

    [1]   "[#13]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

    [2]   After the motion and the government's initial response were filed, I ordered supplemental briefing on the motion and invited the filing of *amicus curiae* briefs on the issues presented by and inherent to the motion.  (**See Order for Supplemental Briefing** [#20], filed December 18, 2009.)  The parties timely submitted their supplemental briefing, and three *amici* submitted briefs in response to my invitation for same.  (**See Proposed Brief of *Amicus Curiae* Eugene Volokh** [#30-3], filed January 15, 2010; **Amicus Curiae Brief of The Rutherford Institute in Support of Defendant's Motion To Dismiss** [#31-3], filed January 19, 2010; ***Amicus Curiae* Brief of the American Civil Liberties Union of Colorado** [#35-2], filed January 19, 2010.)  I wish to express my thanks to all *amici* for their thoughtful and helpful submissions.

Defendant is charged with violating the Stolen Valor Act of 2005, which amended 18 U.S.C. § 704.  As originally enacted, section 704 criminalized the wearing, manufacture, or sale of unauthorized military awards.  *See* 18 U.S.C. § 704(a). Congress, however, felt that this statute was inadequate to protect "the reputation and meaning of military decorations and medals."  Pub. L. No. 109-437 § 2, 102 Stat. 3266, 3266 (2006).  The Stolen Valor Act expands the protections of section 704 to make it crime to

> falsely represent[] [oneself], verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item
> . . .

*Id.* § 3 (codified at 18 U.S.C. § 704(b)). Section 704(d) provides enhanced penalties for violations implicating certain types of military honors, including, of particular relevance in this case, the Purple Heart and the Silver Star.[3]  The Amended Information charges defendant with falsely representing himself to have been awarded a Purple Heart on four different occasions in 2006 and 2009, and falsely representing that he had been awarded a Silver Star on one occasion in 2009.  By the instant motion, defendant seeks to dismiss these charges, arguing that the Act is facially invalid as a content-based restriction on free speech.

Attempting to side-step the First Amendment analysis implicated by the motion, the government contends that defendant's admittedly false statements enjoy no First

---

[3]  Section 704(c) provides enhanced penalties for violations implicating the Congressional Medal f Honor.

Amendment significance at all.  Although conceding that some falsehoods may be

protected in the context of encouraging public debate and political discourse – "speech

that 'matters'" in the government's view – the government maintains that defendant's

statements and other, similar "[p]etty lies . . . do not promote the uninhibited

marketplace of ideas and therefore are not protected" by the First Amendment.

(**Amended Government's Supplemental Brief** at 10 [#27], filed January 11, 2010.)

Stated differently, because defendant was not conveying a political message, speaking

on a matter of public concern, or expressing a viewpoint or opinion, so the argument

goes, his speech does not merit constitutional protection.  The only other court that

appears to have addressed the constitutionality of the Stolen Valor Act relied on a

similar rationale in rejecting a defendant's First Amendment challenge to the statute.

(*See id.* App, Exh. A (**Order Denying Defendant's Motion To Dismiss**, *United States*

*v. Alvarez*, CR 07-1035(A)-RGK).)[4]

        I am not so sanguine.  The government's argument, which invites it to determine

what topics of speech "matter" enough for the citizenry to hear, is troubling, as well as

contrary, on multiple fronts, to well-established First Amendment doctrine.  *See Riley v.*

*National Federation of the Blind of North Carolina*, 487 U.S. 781, 791, 108 S.Ct.

2667, 2674-75, 101 L.Ed.2d 669 (1988) ("The very purpose of the First Amendment is

to foreclose public authority from assuming a guardianship of the public mind through

regulating the press, speech, and religion.  To this end, the government, even with the

---

        [4] The *Alvarez* decision is currently on appeal to the Ninth Circuit.  It was argued and submitted to a three-judge panel for decision on November 4, 2009.  (*See United States v. Alvarez*, No. 08-50345 (9th Cir., filed Aug. 5, 2008).  As of this writing, no decision has been rendered in the case.

3

purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners[.]") (citation and internal quotation marks omitted); ***see also United States v. Playboy Entertainment Group, Inc***., 529 U.S. 803, 826, 120 S.Ct. 1878, 1893, 146 L.Ed.2d 865 (2000) ("We cannot be influenced, moreover, by the perception that the regulation in question is not a major one because the speech is not very important.").

More importantly, however, the United States Supreme Court recently has rejected, in the strongest possible terms, this precise argument.  In ***United States v. Stevens***, – U.S. –, 130 S.Ct. 1577, 2010 WL 1540082 (Apr. 20, 2010), the Court considered the First Amendment ramifications of a federal statute criminalizing the creation, sale, or possession of depictions of animal cruelty.  ***See id.***, 130 S.Ct. at 1583 & n.1 (citing 18 U.S.C. § 48).[5]  The government's primary argument in ***Stevens*** closely tracks that advanced in support of the Stolen Valor Act here:

> [The Government] contends that depictions of illegal acts of animal cruelty that are "made, sold, or possessed for commercial gain" necessarily "lack expressive value," and may accordingly "be regulated as *unprotected* speech."  The claim is not just that Congress may regulate depictions of animal cruelty subject to the First Amendment, but that these depictions are outside the reach of that Amendment altogether –  that they fall into a "'First Amendment Free Zone.'"
>
> . . . .
>
> . . . . [T]he Government points to Congress's "legislative

---

[5]  Although the statute was enacted to reach producers of so-called "crush videos" – featuring the intentional torture and killing of helpless animals – the defendant in ***Stevens*** was accused of having violated the law by selling videos depicting pit bulls engaged in dogfighting and being used to hunt wild boar.  ***Stevens***, 130 S.Ct. at 1583.

> judgment that . . . depictions of animals being intentionally tortured and killed [are] of such minimal redeeming value as to render [them] unworthy of First Amendment protection," and asks the Court to uphold the ban on the same basis. The Government thus proposes that a claim of categorical exclusion should be considered under a simple balancing test: "Whether a given category of speech enjoys First Amendment protection depends upon a categorical balancing of the value of the speech against its societal costs."

*Id.* at 1585 (internal citations omitted; emphasis and first two alterations in original).

The Court's response to that proposal was stark: "As a free-floating test for First Amendment coverage, [it] is startling and dangerous." *Id.* Although acknowledging that descriptions culled from its past precedents could be read to support the government's cost-benefit balancing formula, *id.* at 1585-86, the Court confirmed that

> such descriptions are just that – descriptive. They do not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits tilts in a statute's favor.

*Id.* at 1586. Rather, the Court noted that where speech has been found to enjoy no First Amendment protection, it is not because of its relative value but rather because it is "intrinsically related" to an underlying criminal act. *See id.* (noting that "[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute") (citation and internal quotation marks omitted). Thus the Court affirmed that "[o]ur decisions . . . cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First

5

Amendment." *Id.*

*Stevens* thus counsels extreme delicacy in accepting the government's proposal to remove defendant's speech entirely from the realm of First Amendment consideration.  On the other hand, *Stevens* also recognized that there are a limited universe of "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Id.* at 1584.  One of those categories is fraud.  *Id.* [6]  Although the government did not advance this precise argument that the Stolen Valor Act is a legitimate restriction on fraudulent speech, in the interest of intellectual honesty, I consider it here.

The principal difficulty I perceive in trying to shoehorn the Stolen Valor Act into the First Amendment fraud exception is that the Act, although addressing potentially fraudulent statements, does not further require that anyone have been actually mislead, defrauded, or deceived by such misrepresentations.[7]  To survive constitutional scrutiny,

---

[6]  The case cited by the *Stevens* Court as recognizing a fraud exception to the First Amendment, *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), stated in dicta that "[w]e foresee no obstacle to a State's dealing effectively" with deceptive or misleading commercial speech because "[u]ntruthful speech, commercial or otherwise, has never been protected *for its own sake.*" *Id.*, 96 S.Ct. at 1830 (emphasis added).  This statement, of course, begs the question whether false speech can be protected in service of other ends.

[7]  Although the government argues in a different context that false claims to military honors damage the reputation of those awards (as discussed more fully below), it does not argue for application of a defamation-like standard to claims under the Stolen Valor Act.  Nor could it, as such "group libels" are not constitutionally cognizable, except in circumstances clearly inapplicable here.  *See Weatherhead v. Globe International, Inc.*, 832 F.2d 1226, 1228 (10th Cir. 1987) (group libel requires proof that particular member of group is subject of the defamatory statement).  *See also Rickert v. State Public Disclosure Commission*, 119 P.3d 379, 380 (Wash. App. 2005) (finding unconstitutional state statute prohibiting false statements about political opponents "because it does not require that the candidate be damaged by the false statements"), *aff'd*, 168 P.3d 826 (Wash. 2007); Charles Fried, *The New First Amendment Jurisprudence: A Threat to Liberty*, 59 U. Chi. L. Rev. 225, 238 (Winter 1992) ("Defamation and deception are actionable wrongs . . . [because] they vindicate private rights invoked by, or at least on behalf of, private individuals.  But the First Amendment precludes punishment for generalized public frauds,

a common law cause of action for fraud requires proof of harm or detrimental reliance. *See, e.g., Illinois ex rel. Madigan v. Telemarking Associates, Inc.*, 538 U.S. 600, 620-21, 123 S.Ct. 1829, 1840-41, 155 L.Ed.2d 793 (2003) (noting that "[e]xacting proof requirements" of state law fraud claim, including requirements that "the defendant made the representation with the intent to mislead the listener, and succeeded in doing so," rendered law constitutional as "provid[ing] sufficient breathing room for protected speech"). Clearly, the sponsors of the Act were concerned that false claims regarding military awards would perpetuate fraud. *See* Remarks of Senator Conrad, **Statements on Introduced Bills and Joint Resolutions**, 151 Cong. Rec. S12684-01, S12688 (Nov. 10, 2005) (noting that "imposters use fake medals – or claim to have medals that they have not earned – to gain credibility in their communities. These fraudulent acts can often lead to the perpetration of very serious crimes"). Yet as written, the Act criminalizes the mere utterance of the false statement, regardless whether anyone is harmed thereby. It is merely fraud in the air, untethered from any underlying crime at all. Given the clear language of *Stevens*, I cannot find such incipient and inchoate criminality completely beyond the purview of the First Amendment. *See Stevens*, 130 S.Ct. at 1585-86. Accordingly, I must determine what level of constitutional scrutiny is appropriate.

The government does not seriously contest that the Stolen Valor Act criminalizes speech on the basis of its content. "Content-based restrictions on speech are those which suppress, disadvantage, or impose differential burdens upon speech because of

---

deceptions, and defamation.") (footnotes and internal quotation marks omitted).

its content." *Golan v. Gonzales*, 501 F.3d 1179, 1196 (10th Cir. 2007) (citation and

internal quotation marks omitted).  Stated inversely, "[g]overnment regulation of

expressive activity is content neutral so long as it is justified without reference to the

content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791,

109 S.Ct. 2746, 2754, 109 S.Ct. 2746 (1989) (emphasis, citation, and internal quotation

marks omitted).  Given these standards, there is little doubt that the Stolen Valor Act is

content-based.  By definition, the speech regulated is speech about a particular topic –

the speaker's claim to have been awarded a particular military medal or decoration.

The effect on such speech is not incidental; the entire purpose of the Act is to suppress

those precise utterances.  The Act, in other words, is justified by a desire to curb speech

about a specific topic.  I therefore have little trouble in concluding that the Stolen Valor

Act constitutes a content-based restriction on speech.

    As such, the Act invokes strict scrutiny, and "strict scrutiny leaves few survivors."

*City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425, 455, 122 S.Ct. 1728,

1745, 152 L.Ed.2d 670 (2002) (Souter, J., dissenting).  Because a content-based

restriction is "presumptively invalid . . . the Government bears the burden to rebut that

presumption." *Playboy Entertainment Group, Inc.*, 120 S.Ct. at 1888 (citation and

internal quotation marks omitted).  To do so, the government must establish that the Act

is narrowly tailored to serve a compelling government interest. *Boos v. Barry*, 485 U.S.

312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988).  A compelling governmental

interest is an interest "of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215,

92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).  Accordingly, the universe of interests

sufficiently compelling to justify content-based restrictions on pure speech is extraordinarily limited. *See, e.g.*, *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989) ("We have recognized that there is a compelling interest in protecting the physical and psychological well-being of minors."); *Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 2782, 69 L.Ed.2d 640 (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation.") (citation and internal quotation marks omitted). Because I find that no such compelling interest pertains here, I do not address any potential overbreadth issue.

The government posits that the Act "serves a compelling interest of protecting the sacrifice, history, reputation, honor, and meaning associated with military medals and decorations." (**Amended Government's Supplemental Brief** at 15 [#27], filed January 11, 2010.) Clearly, the Act is intended to preserve the symbolic significance of military medals, but the question whether such an interest is compelling is not at all as manifest as the government's *ipse dixit* implies.[8] Although the analogy is not completely on all fours, I find the Supreme Court's decision in *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), highly instructive. In *Johnson*, the Supreme Court struck down a conviction under a state statute banning flag desecration. The state argued that the statute served a compelling interest in preserving the flag as a symbol of national unity. *Id.*, 109 S.Ct. at 2543. Finding that this rationale was directly related

---

[8] At least one federal district court has concluded that section 704(a), which prohibits the unauthorized wearing of military medals, satisfies the more lenient "legitimate" government interest test applied to expressive conduct. *See United States v. McGuinn*, 2007 WL 3050502 at *3 (S.D.N.Y. Oct. 18, 2007).

to the expressive element of the conduct of burning the flag, and therefore constituted a

content-based restriction on speech, *id.* at 2543-44, the Court rejected the argument

that such an interest was sufficiently compelling to withstand First Amendment scrutiny:

> To conclude that the government may permit designated
> symbols to be used to communicate only a limited set of
> messages would be to enter territory having no discernible
> or defensible boundaries.  Could the government, on this
> theory, prohibit the burning of state flags?  Of copies of the
> Presidential seal?  Of the Constitution?  In evaluating these
> choices under the First Amendment, how would we decide
> which symbols were sufficiently special to warrant this
> unique status?  To do so, we would be forced to consult our
> own political preferences, and impose them on the citizenry,
> in the very way that the First Amendment forbids us to do.

*Id.* at 2546-47.  Following ***Johnson***, I am hard pressed to find that the government's

interest in preserving the symbolic meaning of military awards is sufficiently compelling

to withstand First Amendment scrutiny.

The government attempts to distinguish ***Johnson*** on the basis that the defendant

there had intended to convey a particular viewpoint or political opinion by his act of

burning the flag.  ***See id.*** at 2536-37.  This is true, but still misses the mark.  Because

***Johnson*** dealt with expressive conduct, as opposed to pure speech, a determination

that the defendant intended to express a particular opinion was a precondition to the

First Amendment analysis.  ***See id.*** at 2539 ("In deciding whether particular conduct

possesses sufficient communicative elements to bring the First Amendment into play,

we have asked whether '[a]n intent to convey a particularized message was present,

and [whether] the likelihood was great that the message would be understood by those

who viewed it.'") (citation omitted).  No such condition precedent applies when the

restriction impacts pure speech, as it does in this case.

Moreover, and with the benefit of the Supreme Court's more recent pronouncements in **Stevens**, it is clear that any attempt to differentiate **Johnson** as protecting speech only insofar as it is intended to express an opinion must fail.  Indeed, it strikes me as unlikely that those who make, sell, or possess "crush videos" are seeking to convey a political message, express a viewpoint or opinion, or debate a matter of public concern.  **See Stevens**, 130 S.Ct. at 1583 (noting that such depictions "appeal to persons with a very specific sexual fetish who find them sexually arousing or otherwise exciting") (citation and internal quotation marks omitted).  Nevertheless, the Supreme Court has confirmed that such speech is not completely outside the First Amendment.

The government further argues that the Act promotes a compelling interest in promoting heroism and sacrifice by our military personnel and, more particularly, that "[d]iluting the meaning or significance of medals of honor, by allowing anyone to claim to possess such decorations, could impact the motivation of soldiers to engage in valorous, and extremely dangerous, behavior on the battlefield." (**Government Response to Amicus Curiae Brief of The Rutherford Institute (Doc. 31-3)** at 12 [#42], filed February 8, 2010;  *see id*. at 8-9 (suggesting that "soldiers may well lose incentive to risk their lives to earn such awards".)  This wholly unsubstantiated assertion is, frankly, shocking, and indeed, unintentionally insulting to the profound sacrifices of military personnel the Stolen Valor Act purports to honor.  To suggest that the battlefield heroism of our servicemen and women is motivated in any way, let alone in a

compelling way, by considerations of whether a medal may be awarded simply defies my comprehension. Indeed, the qualities of character that the medals recognize specifically refute the notion that any such motivation is at play. I find it incredible to suggest that, in the heat of battle, our servicemen and women stop to consider whether they will be awarded a medal before deciding how to respond to an emerging crisis. That is antithetical to the nature of their training, and of their characters. Servicemen and women may be motivated to enlist and fight by the ideals the medals represent, but I give no credence to the notion, and, more to the point, the government has offered no evidence in support of its burden to prove, that the medals themselves provide potential recipients any incentive to act to protect their comrades-at-arms or the interests of this nation they have sworn to defend.

I acknowledge that there is much irony, to put it gently, in concluding that the core values of our system of governance, which our military men and women serve to defend with their very lives, are here invoked to protect false claims of entitlement to the honors that recognize the most courageous instances of that service. Nevertheless, I have profound faith – a faith that appears to be questioned by the government here – that the reputation, honor, and dignity military decorations embody are not so tenuous or ephemeral as to be erased by the mere utterance of a false claim of entitlement. The social approbation that attends those who would attempt to bask in the reflected glory of honors they have not earned demonstrates that the people of this nation continue to revere our brave military men and women regardless of – or perhaps even more so

because of – false and vainglorious attempts to appropriate such accolades.[9]

What the Supreme Court stated in relation to the impregnable symbolism of the American flag is equally true of the reputation, honor, and dignity of our nation's military decorations:

> We are fortified in today's conclusion by our conviction that forbidding criminal punishment for conduct such as [defendant's] will not endanger the special role played by our flag or the feelings it inspires. . . . .
>
> We are tempted to say, in fact, that the flag's deservedly cherished place in our community will be strengthened, not weakened, by our holding today.  Our decision is a reaffirmation of the principles of freedom and inclusiveness that the flag best reflects, and of the conviction that our toleration of criticism . . . is a sign and source of our strength. . . .  It is the Nation's resilience, not its rigidity, that [the government] sees reflected in the flag – and it is that resilience that we reassert today.
>
> . . . .  We do not consecrate the flag by punishing its desecration, for in doing so we dilute the freedom that this cherished emblem represents.

*Johnson*, 109 S.Ct. at 2547-48.  Imposters such as defendant abase themselves. Fortunately, their disingenuousness is insufficient to undermine the stalwart and unswerving dignity and honor of our true military heroes, and of the military awards that recognize their sacrifices on behalf of a grateful nation.

---

[9] Indeed, the fact that grassroots efforts to unmask imposters such as defendant appear to be thriving attests to the veracity of this proposition. *See Medal of Honor Imposters*, *available at* http://homeofheroes.com/valor/01_MOH/imposters/index.html (giving tips on "How To Spot a Phony" and "What To Do if You Identify an Imposter," and including a link to the Honor Roll, listing all Medal of Honor recipients); Michael Taylor, *Tracking Down False Heroes; Medal of Honor recipients go after imposters*, SAN FRANCISCO CHRONICLE, May 31, 1999 (noting that, although few imposters receive the full punishment available by law, for "real recipients, the point is to expose the frauds and let the public know that the medal is not awarded for any one person, but, in a sense, for everyone who ever went to battle and particularly for those who did not come home"), *available at* http://articles.sfgate.com/ 1999-05-31/news/17689095_1_congressional-medal-honor-recipients-veterans-day-parades.

**THEREFORE, IT IS ORDERED** as follows:

1.  That defendant's **Motion To Dismiss Information** [#13] filed December 2, 2009, is **GRANTED**;

2.  That The Stolen Valor Act is **DECLARED** to be facially unconstitutional as a content-based restriction on speech that does not serve a compelling government interest, and consequently that the Act is invalid as violative of the First Amendment;

3.  That the **Amended Information** [#15] filed December 14, 2009, is **DISMISSED WITH PREJUDICE**; and

4.  That the defendant and his bond **ARE DISCHARGED**.

Dated July 16, 2010, at Denver, Colorado.

BY THE COURT:

Bob Blackburn

Robert E. Blackburn
United States District Judge

14